[Nos. A041079, A042093, A045648, A045594. First Dist., Div. Two. Jan. 25, 1991.]

MURIEL J. BELL et al., Plaintiffs and Respondents, v. AMERICAN TITLE INSURANCE CO. et al., Defendants and Appellants.

[And six other cases.]*

**[Opinion certified for partial publication.†]**

---

*California Bank Consumers Association v. AEI; Bierenbaum v. Ticor Title Insurance Co.; Cook v. T. D. Service Co.; Conrad v. T. D. Service Co.; Burry v. T. D. Service Co.; California Bank Consumers Association v. T. D. Service Co.

†Pursuant to California Rules of Court, rules 976.1 and 976(b), this opinion is certified for publication with the exception of sections I-A-2, I-A-3, I-A-4, I-B, I-C and II.

1590

1594

**COUNSEL**

David B. Bloom and Martin A. Cooper for Defendants and Appellants.

Miller, Starr & Regalia, Edmund L. Regalia, Richard G. Carlston, Atwood, Knox & Anderson, Stanford H. Atwood, Robert Knox, Tobin & Tobin, Martin Orlick, Townsend, Bardellini, Townsend & Wechsler, Peter L. Townsend, Levinson & Lieberman, Burton S. Levinson, Khourie, Crew & Jaeger, Michael N. Khourie, Daniel J. Furniss, James G. Gilliland, Jr., and Mark T. Jansen for Plaintiffs and Respondents.

## OPINION

**BENSON, J.**—These four consolidated appeals follow the court approved settlement of two coordinated class actions: the *Trustee Sale Guarantee Cases* and the *Foreclosure Fee Cases*. Generally, the cases involved charges imposed on defaulting parties during the nonjudicial foreclosure process. In the *Trustee Sale Guarantee Cases*, appellants challenge orders precluding opt outs from the class, setting the form and content of notice to the class of settlement, enjoining prosecution of similar claims outside the coordinated proceedings, denying leave to intervene, and sanctioning their counsel. In the *Foreclosure Fee Cases*, appellants challenge the order approving final distribution of the settlement fund. We affirm in both of the coordinated cases.

### FACTUAL AND PROCEDURAL BACKGROUND

*The Trustee Sale Guarantee Cases*

On April 6, 1984, Bell v. American Title Insurance Co. et al. (*Bell*) was filed in San Francisco. Plaintiffs were a class of California property owners who defaulted on loans secured by their property. To prevent nonjudicial foreclosure, the class members were required to pay for a title insurance policy, known as a trustee sale guaranty (TSG), when they reinstated or redeemed their delinquent loans. The *Bell* plaintiffs alleged that defendants, the major title insurance companies operating in California, combined and conspired to raise the price of TSG's and to force the sale of unnecessary TSG's in violation of the Cartwright Act (Bus. & Prof. Code, § 16720 et seq.) and Business and Professions Code section 17200 et seq. Defendants also allegedly violated Insurance Code section 12404 and their fiduciary duty as agents through unlawful referrals, self-dealing, and overcharges in the sale of TSG's. *Bell* was assigned to San Francisco Superior Court Judge John A. Ertola for all purposes.

The California Bank Consumers Association (CBCA), represented by attorney and appellant Donald W. Ricketts, was aware of the existence of

the *Bell* case by no later than August 1984. Nevertheless, 11 months later CBCA filed a similar class action, CBCA v. AEI, Inc. et al. (*AEI*), in Los Angeles. CBCA requested certification of mandatory (no-opt-out) classes in *AEI*. The *Bell* plaintiffs sought to have those portions of *AEI* that related to TSG claims coordinated with *Bell*. Meanwhile, the *Bell* plaintiffs moved for certification as a class action.

Having been appointed coordination motion judge, Judge Ertola temporarily stayed further proceedings in *AEI* on March 14, 1986, pending resolution of the petition to coordinate. On May 16, 1986, the motion to coordinate the TSG portions of *AEI* was granted, and class certification proceedings were allowed to proceed. Subsequently, the TSG claims in *Bierenbaum* v. *Ticor* (*Bierenbaum*), which had been filed in Los Angeles, were also coordinated into the *Trustee Sale Guarantee Cases*.

On April 9, 1987, the trial court granted the *Bell* plaintiffs' motion for class certification. It defined the class as "[a]ll persons who own or owned real property in California which property was or is being subjected to non-judicial foreclosure proceedings between January 1, 1977, and the present, who reinstated or redeemed the loans secured by said property prior to trustee sale, and who paid for a Trustee Sale Guarantee sold by one or more of the defendants in connection therewith." The court found the named plaintiffs were members and adequate representatives of the class. It also found their counsel were competent and qualified to represent the class. This order is not challenged by CBCA or any other parties.

On August 28, 1986, Attorney Ricketts filed another action involving TSG claims, entitled Brymer v. T.D. Services (*Brymer I*), in Los Angeles County Superior Court (action No. 614498). The complaint was later amended to include class action allegations. CBCA and appellants Robert and Wendy Brymer, represented by Ricketts, then filed another, similar action in Los Angeles, entitled Brymer v. All-Cal Title Company (*Brymer II*) (action No. C 624 369), which named hundreds of defendants. They also filed an action in federal court in Los Angeles, entitled CBCA and Robert and Wendy Brymer v. Chicago Title Insurance Co. (*Brymer III*) (C.D.Cal. No. CV-87-01401-JSL), stating TSG claims under federal antitrust law.

On June 24, 1987, the *Bell* plaintiffs in the *Trustee Sale Guarantee Cases* sought a temporary restraining order, order to show cause, and preliminary injunction against Ricketts and CBCA. They sought an injunction which, among other things, would prevent Ricketts from litigating cases challenging the purchase, sale, or pricing of TSG's outside the *Trustee Sale Guarantee Cases*. Plaintiffs identified *Brymer I* and the other actions filed by Ricketts as actions which would be affected by the injunction. They argued the

temporary restraining order was necessary to protect the claims of the plaintiff class and to reduce litigation costs in the *Trustee Sale Guarantee Cases.*

The next day the court issued an order to show cause and a temporary restraining order which, among other things, "enjoined [CBCA and Ricketts] from further prosecuting or filing any cases challenging the purchase, sale or pricing of Trustee Sales Guarantees in nonjudicial foreclosures in California or challenging the prosecution of any pending cases regarding the pricing or sales of Trustee Sales Guarantees in non-judicial foreclosures in California, except within the above-captioned coordinated proceedings."

Nevertheless, Ricketts filed a motion for summary judgment in *Brymer I* on July 16, 1987. After receiving the motion, counsel for defendant Ticor Title Insurance Co. (Ticor) asked Ricketts to withdraw the motion. Ricketts refused. On July 24, 1987, the *Trustee Sale Guarantee Cases* court granted Ticor's ex parte application for a stay of *Brymer I* and issued an order to show cause re contempt. At the hearing on the order to show cause, Ticor withdrew its motion to hold Ricketts in contempt. Ticor was, however, given leave to move for sanctions in the form of attorneys' fees incurred in applying for the stay.

Ticor subsequently moved for sanctions against Ricketts under Code of Civil Procedure section 128.5. Ricketts filed opposition, but failed to appear at the hearing. Sanctions of $3,150 were awarded against Ricketts and in favor of Ticor. Ricketts appeals from the order imposing sanctions.

On August 14, 1987, the court denied appellants' motion to coordinate *Brymer I* with the *Trustee Sale Guarantee Cases.* Appellants do not appeal from that ruling.

Also on August 14, 1987, the trial court heard argument on the form and content of class notice in the *Bell* action. The *Bell* plaintiffs suggested notice by publication with defendants to bear the costs. Defendants did not oppose notice by publication, but opposed paying the cost. CBCA filed an opposition urging individual notice to all plaintiffs. However, the court noted CBCA's opposition was untimely. On September 14, 1987, the court ordered notice to class members could be made by publication paid for by the *Bell* plaintiffs.

After holding lengthy hearings on Ricketts's conduct in the litigation, on September 16, 1987, the court issued a preliminary injunction enjoining appellants from litigating TSG claims outside of the *Trustee Sale Guarantee Cases.*

Meanwhile, before notice of class certification had been published, the *Bell* plaintiffs reached a settlement with defendant Ticor after numerous arm's-length bargaining sessions. Ticor agreed that for four years after final approval of the settlement by the trial court and resolution of any appeals, its price for a TSG would be no more than 80 percent of its price for a full title insurance policy and property owners that redeemed or reinstated their loans would receive a $50 or $100 price discount, respectively, from that price. The settlement also required Ticor to notify potential TSG purchasers of the reduced rates. Ticor also agreed to pay restitution of $250,000. However, Ticor insisted that an order precluding opt outs from the class be sought, and demanded the right to withdraw from the settlement if more than 25 class members opted out. The *Bell* plaintiffs estimated Ticor's agreement to roll back prices in the future has a value exceeding $10 million. When it settled, Ticor had a 30 percent share of the California TSG market. The *Bell* plaintiffs expected that the nonsettling defendants would also have to meet the price reductions to remain competitive in the market.

On September 25, 1987, the representative plaintiffs moved for tentative approval of their settlement with Ticor. On October 15, 1987, Ticor and the representative plaintiffs moved to preclude opt outs. Appellants filed untimely opposition to that motion. Characterizing the settlement as "skillful" and finding it to be in the best interest of the plaintiff class, Judge Ertola tentatively approved the settlement on November 20, 1987. He also ruled that opt outs from the class would be precluded.

On the day the Ticor settlement was tentatively approved, the Brymers moved to intervene in the *Trustee Sale Guarantee Cases*. The proposed complaint-in-intervention (*Brymer IV*) named as defendants the attorneys for the plaintiff class, eight individual class members who were plaintiffs in the *Foreclosure Fee Cases*, and hundreds of title companies. It asserted malpractice claims against class counsel and claims for restitution and injunctive relief against the title companies. The *Bell* plaintiffs opposed the motion on various grounds. The trial court denied the motion to file the specific proposed complaint-in-intervention without prejudice.

On January 15, 1988, the Brymers, individually and on behalf of "subclasses," purported to opt out of the certified class in *Bell*, notwithstanding the court's order to the contrary. Ten days later, appellant CBCA also purported to opt out.

Also on January 15, 1988, the Brymers filed a second proposed complaint-in-intervention (*Brymer V*) that eliminated the claims against class counsel and stated claims against five title insurance companies already defendants in the *Trustee Sale Guarantee Cases*. Three of the five defendants

named in *Brymer V* had already settled the class claims. The court denied the Brymers' motion to intervene. The Brymers appeal from the order denying them leave to intervene.

From January through July 1988, class counsel negotiated settlements with all remaining defendants in *Bell*. All settlements provided for price rollbacks for four years beginning upon final approval of the settlements and resolution of appeals. Plaintiffs estimate the total saving on future TSG purchases as approximately $34 million. The total restitution to be paid by the settling defendants is $4-5 million. Defendants agreed to settle only on the condition that opt outs would be precluded. In exchange, defendants would obtain dismissal of the class action with prejudice and release of all claims pertaining to "(i) the purchase, sale or pricing of a Trustee Sale Guarantee or any other form of title insurance or title service in conjunction with a foreclosure, and/or (ii) the reimbursement of another for the purchase or sale of a Trustee Sale Guarantee or any other form of title insurance or title service in conjunction with a foreclosure, and/or (iii) the payment of any portion of a trustee fee claimed or considered to be, or to relate to, the purchase or sale of a Trustee Sale Guarantee or any other form of title insurance or title service in conjunction with a foreclosure."

Class counsel and counsel for defendants met and conferred about the terms of notice of the settlement to the class. The agreed-upon form of notice by publication was presented to the trial court for review. Appellants opposed the settlements, motions to preclude opt outs, and the proposed form of notice.

The trial court tentatively approved the settlement, finding that: "1. The proposed settlements are fair, just and reasonable and in the best interests of the plaintiff class; [¶] 2. The class plaintiffs have and continue to adequately represent the class; [and] [¶] 3. The settlement agreements were the result of arms-length good faith negotiations between plaintiffs and each of the settling defendants . . . ." The court granted defendants' request to preclude opt outs from the settlement and approved the form of notice to the class.

CBCA and its general counsel, attorney Ricketts, nevertheless sent a letter to 7,700 class members urging them to mail a preprinted postcard to the San Francisco Superior Court stating that "I opt out of the Class certified . . . ." Finding the letter full of "[d]isinformation and misinformation," Judge Ertola issued a temporary restraining order prohibiting further unapproved communications with the class by CBCA or Ricketts and ordering them to show cause why they should not be found in contempt for soliciting the opt outs.

After holding evidentiary hearings, the trial court found CBCA and Ricketts in contempt, noting that, "[t]he letter was misleading in several significant respects. First, it failed to disclose that the Court had barred opt-outs, and thus the postcards would be to no effect. Second, the letter implied that CBCA had obtained earlier settlement distributions for plaintiffs when in fact CBCA had opposed the earlier settlements. Third, the letter failed to explain that assuming opt-outs had been permitted, a plaintiff who opted out would forego receiving a distribution from the current settlement." "By mailing the letter, CBCA and Ricketts encouraged members of the plaintiff class to do what CBCA and Ricketts knew what was precluded by the Court's September 14 and November 20 orders. Ricketts and CBCA thereby violated both the letter and the spirit of the Court's . . . orders barring opt-outs."

The trial court also found beyond a reasonable doubt that: (1) "Ricketts and CBCA had attempted in other class actions to impede settlements for their own personal gain"; (2) "CBCA and Ricketts had repeatedly worked to impede and delay the resolution of other class actions and proceedings"; (3) "CBCA is not a bona fide consumer organization, but rather is a shell used by Ricketts to further his own interests"; (4) "Ricketts, through CBCA, has made a practice of disrupting class action settlements"; (5) "Ricketts and CBCA have repeatedly intervened in class actions for the primary, if not exclusive, purpose of extorting fees for themselves, notwithstanding the fact that they had not made any constructive contribution on behalf of the plaintiffs in those cases"; and (6) "that Ricketts and CBCA deliberately violated the Court's orders for the purpose of obstructing the settlements in the hope that the parties would offer to pay Ricketts and/or CBCA to drop their objections and obstructive activities." The court found Ricketts and CBCA each guilty of 7,700 counts of contempt (one for each letter to class members), fined them $77,000 each, and conditionally suspended all but $7,000 of the fine. Neither Ricketts nor CBCA appeals from the court's order or challenges its findings.

Notice of the settlement and the upcoming hearing on final approval was published twice in the San Francisco Chronicle, Oakland Tribune, San Jose Mercury News, Sacramento Bee, Fresno Bee, Los Angeles Times, Orange County Register, and the San Diego Union. Class plaintiffs also notified 125 consumer protection and legal aid offices throughout the state. The hearing on final approval of the settlement was then held December 9, 1988. Appellants were the only parties who appeared to oppose the settlement. On February 16, 1989, the court entered findings of fact and conclusions of law finally approving the settlement. A judgment of dismissal was entered the next day. CBCA and the Brymers appeal from that judgment.

*The Foreclosure Fee Cases*

In mid-1982, four cases were filed in San Francisco and Los Angeles Counties against Trust Deed Service Co. (TDSC), a foreclosure servicing company, and other parties. These actions challenged defendants' alleged practice of charging homeowners maximum trustees' fees to halt nonjudicial foreclosures and then kicking back one-half of the fee collected to the lender. These cases were coordinated as the *Foreclosure Fee Cases* and Judge Ira Brown was appointed coordination judge. Plaintiffs in the lead case of Cook v. TDSC were represented by the same counsel who later represented the representative plaintiffs in the *Trustee Sale Guarantee Cases*. Plaintiffs in Burry v. TDSC and California Bank Consumers Association v. TDSC were represented by attorney Ricketts.

On September 26, 1985, Judge Brown granted final approval of a settlement in the *Foreclosure Fee Cases* that called for defendants to pay approximately $4.4 million. Judgment of dismissal with prejudice was entered by the court that day. No timely appeal from the judgment was taken by any party.

After distributing settlement proceeds to class members who had made claims, some funds remained. On February 1, 1989, Judge Brown approved a plan of final distribution that called for: (1) further distribution to class members who had perfected a claim; (2) allocating $100,000 for giving notice of the settlement in the *Trustee Sale Guarantee Cases*; (3) paying further attorneys' fees and costs incurred by the settlement administrator; and (4) distributing the balance to the Homeowners Project of the Consumers' Union. Plaintiff CBCA appeals from this ruling on final distribution.

## DISCUSSION

### I.

*Trustee Sale Guarantee Appeals*

Three appeals have been taken from the judgment and various rulings in the *Trustee Sale Guarantee Cases* (A045648, A042093, & A041079). They have now been consolidated before this court. We separately address the issues raised in each appeal.

A. *Appeal From the Final Judgment (A045648)*

Class members Robert and Wendy Brymer and plaintiff CBCA appeal from the final judgment entered in the *Trustee Sale Guarantee Cases*. They

raise the following issues, addressed individually below: (1) whether the trial court properly ruled that class members could not opt out of the class and settlements; (2) whether the form and manner of class notice was correct; (3) whether the trial court properly enjoined other actions involving trustee sale guarantee claims from being litigated outside the coordinated *Trustee Sale Guarantee Cases*; and (4) whether the class representatives had standing to settle the claims.

## 1. *Preclusion of Opt Outs*

### (a) *The Ticor Settlements*

◼ At each of the two phases of the settlement process separate motions were brought to preclude opt outs. The first was brought by defendants Ticor Title Insurance Company of California and Ticor Title Insurance Company (collectively Ticor) on October 15, 1987. The record contains written opposition by appellant CBCA, dated and served November 4, 1987. However, at the November 13, 1987 hearing, the trial court found CBCA's opposition was untimely and ordered it stricken. Besides filing no timely opposition to the motion, appellants failed to appear at the hearing, either to contest the opt-out issue or to argue that the court should consider their untimely written opposition. Ticor's motion to preclude opt outs was thus unopposed.[1] The motion was granted.

◼ Failure to register a proper and timely objection to a ruling or proceeding in the trial court waives the issue on appeal. (See, e.g., *Sabella* v. *Southern Pac. Co.* (1969) 70 Cal.2d 311, 318 [74 Cal.Rptr. 534, 449 P.2d 750] [failure to object to misconduct]; *Cummings* v. *Cummings* (1929) 97 Cal.App. 144, 149 [275 P. 245] [failure to oppose motion].) ◼ Having failed to effectively oppose Ticor's motion in the trial court, appellants have thus waived any objections to the resulting order precluding opt outs from the Ticor settlements.

### (b) *The Remaining Settlements*[2]

◼ The statutory basis for class actions in California is found in Code of Civil Procedure section 382, which provides in relevant part that "when the question is one of a common or general interest, of many persons, or when

---

[1] Ticor states that counsel for CBCA appeared at the hearing but did not object or seek to be heard. However, on closer review of the record, it appears CBCA's counsel did not appear at the November 13th hearing but instead appeared at a subsequent hearing on another issue, the transcript of which is in the same volume as the November 13th hearing.

[2] Appellants CBCA and the Brymers did oppose the subsequent motion to preclude opt outs from the remaining settlements. We therefore reach the merits of the issue.

the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all." Appellants do not contend the *Trustee Sale Guarantee Cases* were improperly certified as class actions under section 382. Instead, they argue they were denied due process by the trial court's order precluding class members from opting out of the class and settlement.

 Section 382 does not address when the trial court should afford a right to opt out. However, "[i]t is well established that in the absence of relevant state precedents trial courts are urged to follow the procedures prescribed in rule 23 of the Federal Rules of Civil Procedure (28 U.S.C.) for conducting class actions." (*Frazier* v. *City of Richmond* (1986) 184 Cal.App.3d 1491, 1499 [228 Cal.Rptr. 376], citing *Green* v. *Obledo* (1981) 29 Cal.3d 126, 145-146 [172 Cal.Rptr. 206, 624 P.2d 256]; *City of San Jose* v. *Superior Court* (1974) 12 Cal.3d 447, 453 [115 Cal.Rptr. 797, 525 P.2d 701, 76 A.L.R.3d 1223].)

 Rule 23 of the Federal Rules of Civil Procedure[3] (28 U.S.C.) establishes three types of class actions, under subdivisions (b)(1), (b)(2), and (b)(3). (See *Frazier* v. *City of Richmond, supra,* 184 Cal.App.3d at p. 1499.) The ability of a class member to exclude himself or herself from the judgment by opting out of the class generally depends on which subdivision applies. (See 7A Wright et al., Fed. Practice and Procedure: Civil 2d (1986) § 1775, pp. 447, 491.) The federal courts have determined that when classes are certified under rule 23(b)(1) or (b)(2), there is no right to opt out. (*Howard* v. *McLucas* (11th Cir. 1986) 782 F.2d 956, 961; *In re Jackson Lockdown/MCO Cases* (E.D.Mich. 1985) 107 F.R.D. 703, 710-713; *Avagliano* v. *Sumitomo Shoji America, Inc.* (S.D.N.Y. 1985) 107 F.R.D. 748, 749). California follows the same rule. (*Frazier, supra,* at pp. 1499-1503.) Rule 23(c)(2), on the other hand, provides that in (b)(3) class actions, class members are entitled to individual notice of their right to opt out of the class.

 The trial court has great discretion in decisions on certifying class actions. (*Richmond* v. *Dart Industries, Inc.* (1981) 29 Cal.3d 462, 470 [174 Cal.Rptr. 515, 629 P.2d 23].) More specifically, in determining whether a class action should be mandatory (that is, without any right to opt out), or permissive, the trial court "must be vested with considerable discretion." (*Frazier* v. *City of Richmond, supra,* 184 Cal.App.3d at p. 1500.) That decision "should not be upset on appeal in the absence of an abuse of the trial court's discretion . . . ." (*Frazier, supra,* at p. 1503.)

---

[3] Unless otherwise noted, all references to rules are to the Federal Rules of Civil Procedure.

 ██ The first question is therefore whether the trial court abused its discretion by treating the *Trustee Sale Guarantee Cases* as within the scope of rule 23(b)(1) or (b)(2), with no right to opt out.

*Rule 23(b)(1)*

Rule 23(b)(1) applies where "the prosecution of separate actions by or against individual members of the class would create a risk of [¶] (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or [¶] (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests . . . ."

 To fall within rule 23(b)(1)(A) there "must be a risk that separate actions will in fact be brought if a class action is not permitted." (7A Wright et al., *supra*, § 1773, p. 427.) Here, multiple separate actions were initiated: the three coordinated cases (*Bell, AEI*, and *Bierenbaum*) as well as *Brymer I, Brymer II*, and *Brymer III*. The likelihood of further actions by class members is also clear from appellants' attempts to opt out of the class, apparently to pursue separate litigation.

 The remaining factor indicating rule 23(b)(1)(A) status is that allowing separate actions to proceed would expose the party opposing the class "to a serious risk of being put into a 'conflicted position' " where "different results in separate actions would impair the opposing party's ability to pursue a uniform continuing course of conduct." (7A Wright et al., *supra*, § 1773, p. 431.) Here, the class sought injunctive relief prohibiting the defendant title companies from, among other things, fixing prices for trustee sale guaranties and from overcharging the class for such products. Such injunctive relief "easily could create potential conflicts for the opposing party if it were awarded or denied in individual actions." (*Id.* at § 1772, p. 424.) It was thus within the trial court's discretion to treat the action as falling within the scope of rule 23(b)(1)(A).

*Rule 23(b)(2)*

It was also within the trial court's discretion to find the *Trustee Sale Guarantee Cases* met the requirements of rule 23(b)(2).[4] A case is

---

[4] It is quite common for actions to fall under rule 23(b)(1) and one or more of the other categories of rule 23(b). (7A Wright et al., *supra*, § 1772, p. 425; 1 Newberg on Class Actions (2d ed. 1985) § 4.01, p. 270.)

properly certified under subdivision (b)(2) when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole . . . ." It must be alleged that "the party opposing the class either has acted in a consistent manner toward members of the class so that his actions may be viewed as part of a pattern of activity, or has established or acted pursuant to a regulatory scheme common to all class members." (7A Wright et al., *supra*, at § 1775, p. 449.) Here, plaintiffs alleged defendants concertedly acted to sell unnecessary and overpriced trustee sale guaranties to all class members as part of the statutorily regulated non-judicial foreclosure process, which satisfies the first element.

 "The second prerequisite to bringing an action under rule 23(b)(2) is that final injunctive or declaratory relief must be requested against the party opposing the class." (7A Wright et al., *supra*, § 1775, at p. 457.) As noted above, plaintiffs requested precisely such relief.

They did, however, also seek money damages. The advisory committee notes discussing rule 23(b)(2) state that "[t]he subdivision does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages."[5] (Proposed Rules of Civ. Proc. (1966) 39 F.R.D. 69, 102.) While the final relief may not relate predominantly to money damages, "[c]lass actions certified under Rule 23(b)(2) are not limited to actions requesting only injunctive or declaratory relief, but may include cases that also seek monetary damages." (*Probe* v. *State Teachers' Retirement System* (9th Cir. 1986) 780 F.2d 776, 780 [request for money damages did not prevent (b)(2) certification where court found primary claim was for injunctive relief]; see e.g., *Lloyd* v. *City of Philadelphia* (E.D.Pa. 1988) 121 F.R.D. 246, 251; *Rivera* v. *Patino* (N.D.Cal. 1981) 524 F.Supp. 136 [pension benefits sought as ancillary monetary relief]; *Smith* v. *B & O R. Co.* (D.Md. 1979) 473 F.Supp. 572 [money damages secondary to declaratory and injunctive relief]; *Bertozzi* v. *King Louie Intern., Inc.* (D.R.I. 1976) 420 F.Supp. 1166, 1180-1181 [(b)(2) certification granted where plaintiffs sought both final injunctive relief and substantial monetary award]; *Stavrides* v. *Mellon Bank, N.A.* (W.D.Pa. 1975) 69 F.R.D. 424, 435 [in antitrust action seeking both treble damages

---

[5] Unlike (b)(2) actions, there is no requirement that actions under (b)(1) predominantly seek injunctive or declaratory relief. Assuming the other requirements of the subdivision are met, monetary damage claims may be a major if not predominant remedy sought in a (b)(1) case. (See e.g., *In re A.H. Robbins Co., Inc.* (4th Cir. 1989) 880 F.2d 709; *Robertson* v. *National Basketball Association* (S.D.N.Y. 1975) 389 F.Supp. 867; *Hernandez* v. *Motor Vessel Skyward* (S.D.Fla. 1973) 61 F.R.D. 558; *Zachary* v. *Chase Manhattan Bank* (S.D.N.Y. 1971) 52 F.R.D. 532.)

and injunctive relief, class certified under (b)(2) since money damage claims did not predominate]; *Bing* v. *Roadway Express, Inc.* (5th Cir. 1973) 485 F.2d 441, 447 [backpay sought along with injunctive relief in employment discrimination action].)

California courts have also afforded rule 23(b)(2) status where the final relief sought includes both injunctive relief and monetary damages. (See *Frazier* v. *City of Richmond, supra,* 184 Cal.App.3d at p. 1501 [case not predominantly for money damages and (b)(2) status appropriate where monetary relief sought was integrally related to and would directly flow from the injunctive relief]; *Gonzales* v. *Jones* (1981) 116 Cal.App.3d 978 [171 Cal.Rptr. 567] [(b)(2) status permitted in action for injunctive, declaratory and mandamus relief, including a request for retroactive general assistance benefits]; *Lowry* v. *Obledo* (1980) 111 Cal.App.3d 14 [169 Cal.Rptr. 732] [(b)(2) status permitted in action to have a provision in the aid to families with dependent children program declared invalid and for recomputation of past benefits].)

 The parties dispute whether the damages claims or the requests for injunctive relief in the *Trustee Sale Guarantee Cases* are predominant. Obviously, both forms of relief are important. "Because the predominance test in this context is dependent on the exercise of sound discretion by the court, there is little doubt that reasonable courts can and do reach opposite results under similar circumstances. No clear standards have been or could be developed to yield more predictable results in this area so pregnant with judicial discretion." (1 Newberg on Class Actions, *supra,* § 4.14, p. 298; *Frazier* v. *City of Richmond, supra,* 184 Cal.App.3d at p. 1500.) Here, the trial court implicitly found the case was predominantly for injunctive relief since it effectively afforded rule 23(b)(2) status. The trial judge, who had handled the case for four years, was clearly in the best position to determine this question. We see no justification in the record for overturning his evaluation of the realities of the litigation before him. Moreover, the settlement, with its heavy emphasis on prospective, in effect injunctive, relief is consistent with concluding the case focused primarily on preventing future pricing abuses. Thus, treating the *Trustee Sale Guarantee Cases* as within the scope of rule 23(b)(2) was not an abuse of discretion.

The identical issue was addressed and resolved in *Real Estate Title and Settlement Services,* 1986-1 Trade Cases, section 67,149, which was based on strikingly similar facts. There, a nationwide class of plaintiffs claimed six title insurance companies had conspired to violate the federal Sherman Act by fixing prices for title search services and settlement services in thirteen states. (*Id.* at § 62,922.) As in the present case, plaintiffs sought treble damages and injunctive relief. Arm's-length, good faith settlement negotiations were conducted. (*Id.* at § 62,924.) An agreement was reached that

enjoined defendants from participating in rating bureaus in some states, required an increase of $5,000 in coverage on title insurance policies with no increase in premiums, and provided for payment of attorneys' fees and expenses not to exceed $715,000. (*Id.* at 62,924-62,925.) In return, the class released all monetary and nonmonetary claims against defendants arising from the violations alleged in the class complaint. (*Id.* at § 62,925.)

The district court tentatively approved the settlement and conditionally certified the plaintiffs' proposed class under rule 23(b)(1) and (b)(2). Notice of the settlement was given by publication. (*Real Estate Title and Settlement Services, supra,* 1986-1 Trade Cases, § 62,925.) After considering the objections of certain parties, the court finally approved the settlement. (*Id.* at § 62,937.)

As in the present case, the trial court rejected the argument that since the complaint sought damages as well as injunctive relief it was improper to certify the class under rule 23(b)(1) or (b)(2). The court explained that, "[t]his argument overlooks the fact that the relief contained in the proposed settlement is primarily injunctive . . . . Certification of the proposed class under Rule 23(b)(2) is not precluded by the fact that the settlement provides for some monetary relief in the form of title policy enhancements, since the primary relief provided is injunctive and since the challenged conduct of the defendants is such that injunctive relief would be appropriate." (*Real Estate Title and Settlement Services, supra,* 1986-1 Trade Cases, § 62,928.)

The court also rejected the argument that class members should have been allowed to opt out:

"I see no need in the present case to require that class members be permitted to opt-out of the proposed settlement. The rights of the proposed class are adequately protected by the Rule 23 requirements that the class he [*sic*] adequately represented by the representative plaintiffs and by qualified counsel, that the class receive some adequate form of notice of the proposed settlement and that the court approve the settlement only if it is fair, adequate and reasonable. [Citations.]

"I also note that the benefits of the proposed settlement are provided to the class without any affirmative action on their part. Thus, they need not have actual notice of the settlement to benefit from it. [Citation.]

"Furthermore, I would not exercise any discretion I may have to require an opt-out provision in this case because to do so would go against the strong public policy in favor of settlement of class actions. See *Cotton* v. *Hinton,* 559 F.2d 1326, 1331 (5th Cir. 1977) ('Particularly in class action

suits, there is an overriding public interest in favor of settlement.') It is, in my view, highly unlikely that defendants would agree to settle this case if they would still face the prospect of having to defend against one or more suits on these same issues by parties who had opted out of the settlement." (*Real Estate Title and Settlement Services, supra,* 1986-1 Trade Cases at § 62,929.)

The Third Circuit affirmed the *Real Estate Title and Settlement Services* decision without an opinion ((3d Cir. 1987) 815 F.2d 695) and the United States Supreme Court denied review. ((1988) 485 U.S. 909 [99 L.Ed.2d 243, 108 S.Ct. 1085].) The decision has also been cited with approval by a leading commentator. (1 Newberg on Class Actions, *supra,* (1990 Supp.) § 4.20, pp. 172-173.) The trial court's decision here mirrors that in *Real Estate Title Services.*

The trial court's treatment of the litigation as a rule 23(b)(1) and/or (b)(2) class action, and not as a (b)(3) action with a right to opt out, is also consistent with the general rule favoring certification under (b)(1) and (b)(2). ■■■ As a rule, "class actions that qualify for class certification under subdivision (b)(1) or (b)(2) should not normally be certified under (b)(3)," even though (b)(3) is such a broad category that it would comprehend all class actions.[6] (1 Newberg on Class Actions, *supra,* § 4.20, p. 310; *Frazier* v. *City of Richmond, supra,* 184 Cal.App.3d at p. 1501 ["any doubts as to whether an action should be classified under 23(b)(2) or 23(b)(3) should be resolved in favor of (b)(2) status"]; *In re A.H. Robbins Co., Inc., supra,* 880 F.2d at p. 728 [where action may qualify under (b)(1) or (b)(3), certification is to be made under (b)(1)]; *Van Gemert* v. *Boeing Company* (S.D.N.Y. 1966) 259 F.Supp. 125, 130-131 [where elements of (b)(1) and (2) are met, but action would also fall within (b)(3), the action must be maintained as a class action under the former, and not under 23(b)(3)].) As explained by one commentator, "[i]f an action can be maintained as a class action under (b)(1) and/or (b)(2), and also under (b)(3), the court should order that the suit be maintained under (b)(1) and /or (b)(2) . . . so that the judgment will have res judicata effect as to all the class (since no member has the right to opt out in a (b)(1) or (b)(2) suit), thereby furthering policy underlying (b)(1) and (b)(2) class suits." (3B Moore & Kennedy, Moore's Federal Practice (2d ed. 1990) 23.31[3], pp. 236-237; 1 Newberg on Class Actions, *supra,* § 4.20, pp. 310-312.) Thus, since the *Trustee Sale Guarantee Cases* could be certified as no opt-out classes under rule 23(b)(1) and/or

---

[6] Rule 23(b)(3) applies when "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy . . . ."

(b)(2), the trial court properly treated them as such, even though they also fell within the broad scope of 23(b)(3).

■ Appellants cite *In re Real Est. Title & Settlement Serv. A. Lit.* (3d Cir. 1989) 869 F.2d 760 for the apparent proposition that the trial court could have certified the claims for equitable relief under rule 23(b)(2), with no right to opt out, and the damage claims separately under rule 23(b)(3), with its corresponding right to opt out. The trial court has discretion to do so in certain instances. (*Id.* at p. 768; *Williams* v. *Burlington Northern, Inc.* (7th Cir. 1987) 832 F.2d 100, 103.) However, the record does not show appellants requested such a procedure in response to the motion to preclude opt outs. Moreover, even if appellants had preserved the issue by raising it in the trial court, they fail to demonstrate how the trial judge abused his discretion by treating the entire action under rule 23(b)(1) or (b)(2). To the contrary, where, as here, the class members are adequately represented by counsel, are given notice and an opportunity to express their objections to the settlement, and the court holds a final hearing to determine the fairness and adequacy of the settlement, the trial court does not abuse its discretion by failing to treat the damages aspect of the case under rule 23(b)(3). (See *Williams* v. *Burlington Northern, Inc., supra,* 832 F.2d at pp. 103-104.)

*Due Process Considerations*

■ Appellants also argue that under *Phillips Petroleum Co.* v. *Shutts* (1985) 472 U.S. 797 [86 L.Ed.2d 628, 105 S.Ct. 2965], the trial court's order precluding opt outs denied them due process. *Shutts* was a class action for money damages brought in the Kansas state courts on behalf of thousands of class members, many of whom were not Kansas residents and had no minimum contacts with the state for purposes of personal jurisdiction. ■ The court held that before the forum state can bind an absent non-resident plaintiff to a class action judgment, "due process requires at a minimum that an absent plaintiff be provided with an opportunity to re-move himself from the class by executing and returning an 'opt out' or 'request for exclusion' form to the court . . . ." (*Id.* at p. 812 [86 L.Ed.2d at p. 642].) The holding is, however, carefully and expressly limited "to those class actions which seek to bind known plaintiffs concerning claims wholly or predominantly for money judgments. We intimate no view con-cerning other types of class actions, such as those seeking equitable relief." (*Id.* at pp. 811-812, fn. 3 [86 L.Ed.2d at p. 642].)

■ *Shutts* does not, by its own terms, compel a due process right to opt out of the present class action. Unlike *Shutts*, the *Trustee Sale Guarantee Cases* include significant claims for equitable relief. It was within the trial court's discretion to find the case was not predominantly for monetary

relief. Moreover, *Shutts* does not reach the issue of due process in no-opt-out classes or decide the constitutional validity of rule 23(b)(1) or (b)(2) classes, as exists here. (See 1 Newberg on Class Actions, *supra*, § 1.14, p. supp. 8; Miller & Crump, *Jurisdiction and Choice of Law in Multistate Class Actions After Phillips Petroleum Co. v. Shutts* (1986) 96 Yale L.J. 1, 39.)

Courts which have addressed the effect of *Shutts* on mandatory classes under rule 23(b)(1) and (b)(2) have interpreted the case as creating no due process right to opt out of such classes. For example, in *Nottingham Partners* v. *Dana* (Del.1989) 564 A.2d 1089, 1097-1101, the Delaware Supreme Court determined whether *Shutts* required that members of a rule 23(b)(2) class seeking both equitable and monetary relief be afforded a right to opt out of a pending settlement. In a thorough due process analysis, the court noted several federal decisions finding no due process right to opt out of rule 23(b)(2) classes. (*Wetzel* v. *Liberty Mutual Insurance Co.* (3d Cir. 1975) 508 F.2d 239, 255-257; *Penson* v. *Terminal Transport Co.* (5th Cir. 1981) 634 F.2d. 989, 994 ["hybrid" rule 23(b)(2) action seeking equitable relief and damages]; *Kincade* v. *General Tire & Rubber Co.* (5th Cir. 1981) 635 F.2d 501, 507.) ▮▮ "The due process clause of the Constitution is satisfied when a Rule 23(b)(2) class action is settled without providing objectors a means of opting out because the objectors are (1) adequately represented by the named plaintiffs, (2) represented by an attorney who is qualified, (3) provided with notice of the proposed settlement, (4) given an opportunity to object to the settlement, and (5) assured that the settlement will not take effect unless the trial judge—after analyzing the facts and law of the case and considering all objections to the proposed settlement—determines it to be fair, adequate, and reasonable." (*Nottingham Partners, supra*, 564 A.2d at p. 1100, quoting *Kincade, supra*, at pp. 507-508.) ▮▮ Notably, each of these factors insuring due process was also present in the *Trustee Sale Guarantee Cases*.

The Delaware Supreme Court concluded that the prior federal decisions denying a due process right to opt out were consistent with and survived the decision in *Shutts*. It thus held that a member of a rule 23(b)(2) class which in part seeks monetary relief does not have a due process right to opt out of the class. (*Nottingham Partners* v. *Dana, supra*, 564 A.2d at p. 1101; see also *In re Jackson Lockdown/MCO Cases, supra*, 107 F.R.D. at pp. 713-714 [where claim for monetary relief did not predominate over claims for injunctive and declaratory relief, the court held *Shutts* did not invalidate rule 23(b)(1) classes and create a right to opt out]; 1 Newberg on Class Actions, *supra*, § 1.14, p. supp. 11 [highly unlikely *Shutts* would have silently

nullified mandatory classes under rule 23(b)(1) or (b)(2) without express language to that effect].)[7]

Further, as two leading commentators have noted, "[o]ne way to view *Shutts* is as a case about distant forum abuse. The right to opt out is essential to the Supreme Court's inference of consent, and that reasoning, in turn, is essential to the Court's validation of jurisdiction over members who have no affiliation with a distant forum." (Miller & Crump, *supra*, *Multistate Class Actions After Shutts*, 96 Yale L.J. at p. 52; see *In re Jackson Lockdown/MCO Cases*, *supra*, 107 F.R.D. at pp. 713-714 [noting *Shutts* court primarily concerned with overextension of state long-arm statutes to bind absent class members living predominantly in other states; found that unlike in *Shutts*, the forum state was convenient for most members of the class].) Here, the plaintiff class was limited to owners of California real property, who have the requisite contacts with the state to satisfy the traditional minimum contacts test for personal jurisdiction. Such a class would not, therefore, be subject to the distant forum abuse the Supreme Court sought to avoid in *Shutts* by giving a right to opt out. Extension of *Shutts* to the present case is thus unnecessary and inappropriate.

The trial court acted within its discretion by precluding opt outs.

### I.-A-2–II.*

. . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment in the *Trustee Sale Guarantee Cases* as well as the orders denying appellants leave to intervene and sanctioning Attorney Ricketts is affirmed. The order approving final distribution of the settlement fund in the *Foreclosure Fee Cases* is affirmed.

Kline, P. J., and Peterson, J., concurred.

A petition for a rehearing was denied February 25, 1991, and appellants' petition for review by the Supreme Court was denied April 18, 1991.

---

[7] After discussing *Shutts*, appellants' opening brief sets forth a number of quotations from California cases which are purportedly in "complete accord" with appellants' expansive interpretation of *Shutts*. However, all of the cited cases in fact predate *Shutts* and none deal with the issue of the right to opt out of classes certifiable under rule 23(b)(1) or (b)(2).

* See footnote, *ante*, page 1589.