[No. G037225. Fourth Dist., Div. Three. Dec. 3, 2007.]

RAE F. ORTIZ, Plaintiff and Appellant, v.
LYON MANAGEMENT GROUP, INC., Defendant and Appellant.

## COUNSEL

Lakeshore Law Center, Jeffrey Wilens; Law Offices of Jeffrey P. Spencer and Jeffrey Spencer for Plaintiff and Appellant.

Irell & Manella, Gregory R. Smith, Marc S. Maister, Garland A. Kelley and Regine Rutherfurd for Defendant and Appellant.

Orrick, Herrington & Sutcliffe, Edwin V. Woodsome, William W. Oxley, Khai LeQuang; Hodel Briggs Winter, Karla J. Kraft, Neyha G. Rajan; Irell & Manella, Marc S. Maister, Garland A. Kelley, Regine Rutherfurd; Kimball, Tirey & St. John, Jeffrey Garland; Lewis Brisbois Bisgaard & Smith, Thomas G. Oesterrich; Soltman, Levitt & Flaherty, Mitchell S. Brachman; Green & Hall, Robert L. Green, Michael J. Pepek; Lynch Gilardi & Grummer, James Parton III and Francis D. Conway for The Irvine Company Apartment Communities, Inc., Shea Properties Management Company, Inc., Fairfield Properties, L.P., Archstone-Smith Trust, Far West Management Corporation, VPM Management, Inc., Apartment Investment and Management Company, FPI Management, Inc., Stratus Real Estate, Inc., Western National Property Management, and Prometheus Real Estate Group, Inc., as Amici Curiae on behalf of Defendant and Appellant.

## OPINION

**IKOLA, J.**—These appeals raise an issue of first impression involving California's credit reporting statutes—the Investigative Consumer Reporting Agencies Act (ICRAA) (Civ. Code, § 1786 et seq.)[1] and the Consumer Credit Reporting Agencies Act (CCRAA) (§ 1785.1 et seq.)—and a novel class action issue.

First, plaintiff Rae F. Ortiz appeals from a summary judgment entered in favor of defendant Lyon Management Group, Inc. Plaintiff alleges defendant violated the ICRAA when it obtained a tenant screening report to assess her rental application.[2] The ICRAA governs "investigative consumer reports"

---

[1] All further statutory references are to the Civil Code unless otherwise stated.

[2] Because the reports in this case were used to screen tenants, we use the term "tenant screening report" to refer generically to reports subject either to the CCRAA or the ICRAA.

containing "information on a consumer's character, general reputation, personal characteristics, or mode of living . . . ." (§ 1786.2, subd. (c).) Plaintiff contends her tenant screening report contained character information because it indicated whether any unlawful detainer actions had been filed against her.

We hold the ICRAA is unconstitutionally vague as applied to tenant screening reports containing unlawful detainer information. Reasonable persons cannot readily determine whether unlawful detainer information constitutes "character" information governed by the ICRAA or "creditworthiness" information governed by the CCRAA. The court correctly granted summary judgment to defendant.

Second, defendant appeals from an order denying its motion for class certification. Defendant filed this motion *after* the court had already granted its summary judgment motion.

We hold defendant could not obtain class certification after the court decided the merits of plaintiff's individual claim. As a general procedural rule, class certification should be determined before the merits are adjudicated. And as a general substantive rule, a precertification decision on the merits against a named plaintiff does not bind absent class members. The court did not abuse its discretion by holding defendant to these general rules. We affirm.

## FACTS

Plaintiff applied to rent an apartment managed by defendant. Plaintiff gave written consent to defendant to obtain a tenant screening report, including an "unlawful detainer (eviction) search." Defendant obtained plaintiff's tenant screening report. The report contained a section entitled, "Court Records on File," which simply stated, "No Court Records Found." The parties agree this section would have disclosed whether any unlawful detainer actions had been filed against plaintiff. They further agree the section correctly indicated no such actions had been filed. Defendant approved plaintiff's application, and she moved into one of defendant's apartments.

Nonetheless, plaintiff sued defendant for violating the ICRAA. She alleged defendant failed to give her a written notice and a report requesting form, as required by the ICRAA (but not the CCRAA). (§ 1786.16, subds. (a)(3), (b)(1).) She sought relief individually and on behalf of a class of similarly situated persons. Under the ICRAA, the statutory violation would carry with it a minimum statutory damage award in her individual action of $10,000. (§ 1786.50, subd. (a)(1).)

---

Our discussion is not limited to reports used to screen tenants, however, as reports subject to these statutes may be used for other purposes. (§§ 1785.3, subd. (c), 1786.12, subd. (d).)

Defendant moved for summary judgment, which the court granted. It found the tenant screening report contained no character information subject to the ICRAA. It noted the court records entry was blank, containing no unlawful detainer or character information at all. Even if it did, the court observed unlawful detainer information would not prove plaintiff had a bad character. The court also held plaintiff's broad reading of the ICRAA would render it unconstitutionally vague and inconsistent with federal law. The court did not, however, immediately enter judgment.

Almost two months later, defendant moved for class certification. The court denied the motion, holding defendant waived any right to class certification by seeking summary judgment on plaintiff's individual claims. The court entered judgment, and both parties appealed.

## DISCUSSION

*The ICRAA Is Unconstitutionally Vague as Applied to Unlawful Detainer Information*

Plaintiff's appeal presents us with a platypus, a categorization challenge.[3] Early zoologists categorized animals into distinct families with little effort until faced with an animal that laid eggs like a reptile but nursed its young like a mammal. The platypus defied the previously discrete categories. It was thought to be hoax, or at least a paradox. The zoologists "solved" this paradox by creating a new category, the monotreme order of mammals, to account for the platypus and its cousin, the spiny anteater. But the paradox arose only because the zoologists had adopted purportedly distinct categories that did not actually correspond to the full variety of animal life.

Our categorization challenge involves tenant screening reports. The Legislature enacted two distinct statutes to regulate tenant screening reports. The ICRAA governs reports containing information on a consumer's character, while the CCRAA governs reports containing information on a consumer's creditworthiness. Whether an unlawful detainer action has been filed against a consumer appears to speak to both creditworthiness and character.[4] Unlawful detainer information defies categorization. But we cannot create a new statute to govern it.

Our challenge arises not because unlawful detainer information is somehow paradoxical, but because the statutory scheme fails to set forth truly

---

[3] (See generally Pirsig, Lila: An Inquiry into Morals (1991) pp. 116–117.)

[4] Defendant cannot sidestep this dispute by noting plaintiff's credit report showed no unlawful detainer actions had been filed against her. The absence of unlawful detainer filings is itself unlawful detainer information.

distinct categories. It presents a false dichotomy between creditworthiness and character. The ICRAA's nebulous reference to character information, as applied to tenant screening reports containing unlawful detainer information, is unconstitutionally vague.

■ "[T]he underlying concern [of a vagueness challenge] is the core due process requirement of adequate *notice*." (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1115 [60 Cal.Rptr.2d 277, 929 P.2d 596] (*Gallo*).) A vague statute cannot be upheld because " 'we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.' " (*Cranston v. City of Richmond* (1985) 40 Cal.3d 755, 763 [221 Cal.Rptr. 779, 710 P.2d 845] (*Cranston*).) "A statute should be sufficiently certain so that a person may know what is prohibited thereby and what may be done without violating its provisions . . . ." (*Lockheed Aircraft Corp. v. Superior Court* (1946) 28 Cal.2d 481, 484 [171 P.2d 21] (*Lockheed*).) "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." (*Connally v. General Const. Co.* (1926) 269 U.S. 385, 391 [70 L.Ed. 322, 46 S.Ct. 126] (*Connally*).)

To determine whether a statute is unconstitutionally vague, it must be "applied in a specific *context*." (*Gallo, supra*, 14 Cal.4th at p. 1116.) Thus, "in judging the constitutionality of [a statute] we must determine not whether [it] is vague in the abstract but, rather, whether it is vague as applied to this appellant's conduct in light of the specific facts of this particular case." (*Cranston, supra*, 40 Cal.3d at p. 765.) Also, the challenged statute need only be reasonably certain or specific. (*Gallo*, at p. 1117.) It "cannot be held void for uncertainty if any reasonable and practical construction can be given to its language." (*Lockheed, supra*, 28 Cal.2d at p. 484.) Finally, "[a]ll presumptions and intendments favor the validity of a statute . . . ." (*Ibid.*)

■ We turn to the statutes. In 1975, the California Legislature enacted two statutes modeled after the Fair Credit Reporting Act (FCRA) (15 U.S.C. § 1681 et seq.).[5] (See *Cisneros v. U.D. Registry, Inc.* (1995) 39 Cal.App.4th 548, 559 [46 Cal.Rptr.2d 233] (*Cisneros*) [noting legislative history].) "[S]tatutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323] (*Dyna-Med*).)

■ The first statute, the CCRAA, governs "consumer credit reports." (§ 1785.1 et seq.) It defines a consumer credit report as "any written, oral, or

---

[5] (Stats. 1975, chs. 1271–1272, pp. 3369–3377, 3377–3387.)

other communication of any information by a consumer credit reporting agency bearing on a consumer's credit worthiness, credit standing, or credit capacity," when that information is collected or used to establish the consumer's eligibility for personal credit, employment, rental housing, or other specified purposes. (§ 1785.3, subd. (c).) As shorthand, we will refer to the type of information governed by the CCRAA as creditworthiness information.

The second statute, the ICRAA, governs "investigative consumer reports." (§ 1786 et seq.) It defines an investigative consumer report as "a consumer report in which information on a consumer's character, general reputation, personal characteristics, or mode of living is obtained through any means." (§ 1786.2, subd. (c).) We will refer to the type of information governed by the ICRAA as character information.

■ The CCRAA and ICRAA impose different obligations on persons compiling or requesting tenant screening reports, depending on whether the information therein pertains to creditworthiness or character.[6] The ICRAA imposes stricter duties and more severe penalties on persons compiling or requesting tenant screening reports containing character information than the CCRAA does on those compiling or requesting tenant screening reports containing creditworthiness information.[7] Consumers have different rights depending on whether their tenant screening reports contain creditworthiness or character information.[8]

This statutory scheme—two separate statutes governing two kinds of tenant screening reports depending on the type of information they contain— indicates a legislative intent to distinguish between creditworthiness information and character information. (See *Dyna-Med, supra,* 43 Cal.3d at

---

[6] (Compare § 1785.10, subd. (d)(1)(A), (B) [agency must disclose to consumer upon request any recipients of the consumer's credit report within the preceding 12 months, or two years if the recipient obtained the report for employment purposes] with § 1786.10, subd. (c)(1), (2) [agency must disclose to consumer upon request any recipients of the consumer's investigative report within the preceding three years, regardless of purpose]; compare § 1785.14, subd. (b) [agency must permanently retain certain consumer information] with § 1786.20, subd. (b) [agency must retain entire investigative consumer report for two years].)

[7] (Compare § 1785.31, subd. (a)(1), (2)(A), (B) [consumer entitled to recover actual damages for CCRAA violation, plus punitive damages limited to $5,000 for a willful violation] with § 1786.50, subds. (a)(1), (b) [consumer entitled to recover actual damages for ICRAA violation or statutory damages of $10,000, whichever is greater, plus punitive damages for a willful violation].)

[8] (Compare § 1785.15, subd. (f) [consumer may obtain copy of consumer credit report for a reasonable charge not exceeding $8] with § 1786.22, subd. (b)(1) [consumer may obtain copy of investigative consumer report for the actual cost of duplication]; compare § 1785.16, subd. (f) [consumer may lodge 100-word statement of dispute in consumer credit report] with § 1786.24, subd. (i) [consumer may lodge 500-word statement of dispute in investigative consumer report].)

pp. 1386–1387 [statutes must be harmonized].) Nothing in the statutes suggests any *one* item of information may constitute *both* creditworthiness and character information such that it alone subjects a tenant screening report to *both* statutes. Rather, any one item of information may be classified as either creditworthiness or character information, but not both. Construing the two statutes to govern discrete items of information harmonizes the statutes, rather than collapsing them into one. (*Ibid.*)

While the statutes require a distinction between creditworthiness and character information, the line between the two is not readily apparent. On the one hand, a consumer's creditworthiness *itself* pertains to the consumer's character or personal characteristics. Creditworthiness is a personal attribute, the quality of being "financially sound enough that a lender will extend credit in the belief that the chances of default are slight; fiscally healthy." (Black's Law Dict. (7th ed. 1999) p. 377, col. 1.) Creditworthiness information is a *type* of character information. On the other hand, certain types of character information may also constitute creditworthiness information. Information that a consumer has the character traits or personal characteristics of (or a general reputation for) dishonesty, profligacy, carelessness, or absentmindedness would reasonably relate to the consumer's financial soundness, likelihood of default, or fiscal health. At least these types of character information pertain to the consumer's creditworthiness.

■ The statutory scheme itself recognizes that creditworthiness information and character information are not inherently exclusive. The two credit reporting statutes do not rely on any necessary distinction between creditworthiness and character to segregate CCRAA reports from ICRAA reports. Rather, each statute expressly excludes from its ambit any reports containing only information covered by the other. The CCRAA expressly excludes "any report containing information solely on a consumer's character, general reputation, personal characteristics, or mode of living which is obtained through personal interviews . . . ." (§ 1785.3, subd. (c).) The ICRAA expressly excludes "a consumer report . . . that is limited to specific factual information relating to a consumer's credit record or manner of obtaining credit obtained directly from a creditor of the consumer . . . ." (§ 1786.2, subd. (c).)

We must give these express exclusions "effect and significance." (*Copley Press, Inc. v. Superior Court* (2006) 39 Cal.4th 1272, 1284 [48 Cal.Rptr.3d 183, 141 P.3d 288]; accord, Code Civ. Proc., § 1858 [courts must construe statutory provisions to "give effect to all"].) " '[T]rue statutory exceptions exist only to exempt something which would otherwise be covered.' " (*Syngenta Crop Protection, Inc. v. Helliker* (2006) 138 Cal.App.4th 1135, 1163 [42 Cal.Rptr.3d 191].) Each statute's express exclusion of reports containing

only information covered by the other shows that, absent the exclusion, the type of information covered by the other statute would also be covered by it. Thus, the CCRAA's scope over creditworthiness information would otherwise *include* character information, at least if obtained through personal interviews, were it not for the express exclusion. And the ICRAA's scope over character information would otherwise *include* creditworthiness information, at least if it consists of specific factual information obtained directly from creditors, were it not for the express exclusion.

In this way, the Legislature recognized the inherent overlap between creditworthiness information and character information. Yet it simultaneously demanded that the two types of information be distinguished when classifying tenant screening reports as subject either to the CCRAA or the ICRAA.

■ This incongruity in the statutory scheme does not undermine all efforts at classification. It is still relatively simple to categorize a traditional credit report containing information on a consumer's credit accounts, outstanding and available credit, and payment histories supplied by the consumer's creditors. This information constitutes creditworthiness information. It may *also* speak to the consumer's character, for the reasons discussed above. But the report is not impermissibly subject to both the CCRAA and the ICRAA, due to the express statutory exclusions. The ICRAA excludes the report because it contains only specific factual information relating to the consumer's credit record obtained directly from the consumer's creditors. (§ 1786.2, subd. (c).) The CCRAA does not exclude the report, even though it contains character information, because the statute excludes only character information obtained "through personal interviews." (§ 1785.3, subd. (c).) Thus, the traditional credit report remains subject to the CCRAA, not the ICRAA.

Until 1998, it was almost as simple to categorize investigative consumer reports. As originally enacted, the ICRAA defined investigative consumer reports as containing "information on a consumer's character, general reputation, personal characteristics, or mode of living . . . obtained through personal interviews . . . ." (§ 1786.2, former subd. (c), added by Stats. 1975, ch. 1272, p. 3377.) This language mirrors the CCRAA's express exclusion for character information. And it provided some restraint on the statute's otherwise expansive scope. An investigative consumer report was defined not just by the *type* of information it contains (i.e., character information), but also by the *means* by which the information was obtained (i.e., through personal interviews). Credit reporting agencies and credit report users could rely on *both* aspects to ascertain whether the information in a tenant screening report would subject it to the ICRAA.

The Legislature removed this restraint in 1998. It amended the ICRAA to eliminate the "through personal interviews" limitation, replacing it with the expansive phrase, "through any means." (§ 1786.2, subd. (c), as amended by Stats. 1998, ch. 988, § 1.) It may have done so in response to *Cisneros, supra,* 39 Cal.App.4th 548, which exempted a report containing the observations of a consumer's landlords from the ICRAA because the credit reporting agency obtained the observations through written questionnaires, not personal interviews. (39 Cal.App.4th at pp. 569–570.) After the amendment, one could still look at the means by which information was obtained to determine whether the report was excluded from the CCRAA. The CCRAA still excludes character information obtained through personal interviews. But one could no longer look at the means by which information was obtained to determine whether it is subject to the ICRAA. One may look only at the type of information—whether it relates to the consumer's character.

By eliminating the means by which information is obtained as a way to distinguish character information subject to the ICRAA, the Legislature exposed an underlying uncertainty in the statute.[9] The uncertainty is revealed when one attempts to categorize information that speaks to both creditworthiness and character, but which is not obtained through personal interviews. This type of information now falls under the ICRAA, due to the 1998 amendment, but it is not excluded from the CCRAA. The information is now subject to both statutes, though the statutory scheme disallows this.

Enter the platypus.

Unlawful detainer information, because of the 1998 amendment, can be categorized under both statutes. *Cisneros*—the case that may have inspired the amendment—shows why. Because *Cisneros* relied on the ICRAA's preamendment "through personal interview" limitation, it had no occasion to consider the broader question of whether unlawful detainer information constitutes character information governed by the ICRAA. (*Cisneros, supra,* 39 Cal.App.4th at pp. 569–570.) But *Cisneros* did consider whether unlawful detainer information falls within the FCRA, which governs reports containing information *either* on a consumer's creditworthiness or character. (15 U.S.C. § 1681a(d).)

---

[9] Nothing suggests the 1998 amendment did anything more than expand the means by which character information subject to the ICRAA may be obtained. Nothing suggests the amendment eliminated the statutory distinction between creditworthiness and character information or permitted any one item of information to make a report subject to both the CCRAA and ICRAA. As the Legislative Counsel's Digest notes, the 1998 amendment simply "redefine[s] an 'investigative consumer report' as a report in which specified consumer information is obtained by any means." (Legis. Counsel's Dig., Sen Bill. No. 1454 (1997–1998 Reg. Sess.).)

*Cisneros* held unlawful detainer information was subject to the FRCA because it pertained to *both* creditworthiness and character. It relied on a federal case noting that information on a tenant's incidents of late payments or nonpayment of rent " 'relates to [the tenant's] "creditworthiness." ' " (*Cisneros, supra,* 39 Cal.App.4th at p. 561, quoting *Cotto v. Jenney* (D.Mass. 1989) 721 F.Supp. 5, 6–7.) It also relied on Federal Trade Commission commentary stating that " '[r]eports about rental characteristics (e.g. consumers' evictions, rental payment histories, treatment of premises) are consumer reports, because they relate to character . . . .' " (*Cisneros,* at p. 562, quoting 16 C.F.R., pt. 600, appen., § 603(d), ¶¶ 4(G) & 6(F) (1995).)

■ *Cisneros* is correct that unlawful detainer information " 'relates to [the tenant's] "creditworthiness." ' " (*Cisneros, supra,* 39 Cal.App.4th at p. 561.) The specific unlawful detainer information in this case—whether unlawful detainer actions had been filed against plaintiff—indicates whether plaintiff's former landlords had formally alleged a legal basis for an unlawful detainer action. (Code Civ. Proc., § 1161.) A typical, perhaps *the* typical, basis for a residential unlawful detainer action is the late payment or nonpayment of rent. (*Id.,* subd. 2.)[10] Thus, unlawful detainer information would most commonly reveal allegations that plaintiff has not timely paid his or her rental obligations. Timely payment of obligations relates to creditworthiness.

Yet *Cisneros* is also correct when it notes unlawful detainer information " 'relate[s] to character.' " (*Cisneros, supra,* 39 Cal.App.4th at p. 562.) Not all unlawful detainer actions are premised on a failure to pay rent on time. An unlawful detainer action may also be premised on holding over after the lease expires, a breach of a lease covenant, the commission of waste, or the maintenance of a nuisance. (Code Civ. Proc., § 1161, subds. 1, 3, 4.) These acts may suggest various character traits or personal characteristics: obstinacy, carelessness, untrustworthiness, or selfishness, perhaps. Even if the allegations are ultimately unproven, the bare fact that a landlord made the allegations may relate to the consumer's general reputation, i.e., character information.

■ Adding to the confusion, good counterarguments exist to each of *Cisneros*'s observations about the nature of unlawful detainer information. Renting an apartment is not truly a credit transaction. Credit is "[t]he time that a seller gives the buyer to make the payment that is due" or "[t]he

---

[10] (See Friedman et al., Cal. Practice Guide: Landlord-Tenant (The Rutter Group 2007) ¶ 7:123, p. 7-35 [implying residential unlawful detainer actions are commonly based on failure to pay rent]; see also 1 Moskovitz, Cal. Eviction Defense Manual (Cont.Ed.Bar 2d ed. 2007) § 6.1, pp. 101–102 [failure to pay rent is "[t]he most common scenario in which the landlord serves the tenant with a 3-day notice" precipitating an unlawful detainer action].)

availability of funds either from a financial institution or under a letter of credit." (Black's Law Dict., *supra*, p. 374, col. 1.) A landlord neither sells property on time nor makes funds available to tenants. And while the various bases for an unlawful detainer action may tend to suggest certain character traits, they do not necessarily reveal the tenant's character. A lease is a contract (§ 1925), and the law ordinarily assigns no moral blameworthiness to breaching a contract. (See *Freeman & Mills, Inc. v. Belcher Oil Co.* (1995) 11 Cal.4th 85, 106 [44 Cal.Rptr.2d 420, 900 P.2d 669] (conc. & dis. opn. of Mosk, J.) ["[T]he intentional breach of contract has come to be viewed as a morally neutral act"].)[11]

We are left with no rational basis to determine whether unlawful detainer information constitutes creditworthiness information subject to the CCRAA or character information subject to the ICRAA. We doubt any "person of ordinary intelligence" can do so either. (*Cranston, supra,* 40 Cal.3d at p. 763.) Rather, credit reporting agencies and landlords "must necessarily guess at [the ICRAA's] meaning and differ as to its application." (*Connally, supra,* 269 U.S. at p. 391.) Worse, landlords must make their guesses when they request tenant screening reports, *before* they learn whether the report will contain any unlawful detainer information or exactly what kind of unlawful detainer information it will include. (See § 1786.16 [listing conditions that must be met *before* procuring investigative consumer reports].)

■ The ICRAA thus fails to provide adequate notice to persons who compile or request tenant screening reports that may contain unlawful detainer information. (*Gallo, supra,* 14 Cal.4th at p. 1115 [noting "the core due process requirement of adequate *notice*"]; *Lockheed, supra,* 28 Cal.2d at p. 484 ["A statute should be sufficiently certain so that a person may know what is prohibited thereby and what may be done without violating its provisions . . ."].) The 1998 amendment rendered the ICRAA unconstitutional as applied to tenant screening reports containing unlawful detainer information. Accordingly, the court correctly granted summary judgment to defendant.[12]

---

[11] (See also Posner, Economic Analysis of Law (2007) pp. 119–120, 270–273 [describing the "efficient breach" theory, which *encourages* intentional contract breaches when they are economically efficient]; see generally Shiffrin, *The Divergence of Contract and Promise* (2007) 120 Harv. L.Rev. 708, 730–733.)

[12] Plaintiff asserted the ICRAA violations also violated the unfair competition law. (Bus. & Prof. Code, § 17200.) Because her unfair competition claim piggybacks on her ICRAA claim, the court correctly granted summary judgment on it as well.

*The Court Correctly Denied Class Certification Because Defendant Had
Already Obtained Adjudication of the Merits of Plaintiff's Individual Claim*

Defendant's appeal raises another issue: May a *defendant* obtain certification of a plaintiff's class after it has obtained a favorable ruling on the merits of the named plaintiff's individual claim? The parties cite no case in which a defendant has even tried this tactic. Lacking direct guidance, we turn to the general rule governing the timing of class certification and apply it to this unprecedented context.

Defendant concedes its tactic appears to conflict with the general *"Home Savings"* rule requiring courts to determine class certification before adjudicating the merits. (*Home Sav. & Loan Assn. v. Superior Court* (1974) 42 Cal.App.3d 1006, 1010–1012 [117 Cal.Rptr. 485] (*Home Savings I*) [court must determine certification before trial]; *Home Sav. & Loan Assn. v. Superior Court* (1976) 54 Cal.App.3d 208, 211 [126 Cal.Rptr. 511] (*Home Savings II*) [court must determine certification before dispositive motion].) We agree; the tactic does conflict with the *Home Savings* rule, for both a procedural and a substantive reason. First, the procedural reason.

1. *Postmerits Class Certification Requires a Showing of Changed
 Circumstances and a Compelling Justification*

*Home Savings I* reversed an order granting the plaintiff's motion to try the defendant's liability before the court would decide whether the plaintiff could obtain class certification. (*Home Savings I, supra,* 42 Cal.App.3d at pp. 1008–1009.) It noted, "The vice in the procedure followed by the trial court is that it allows so-called 'one-way intervention,' a procedure under which potential members of the class can reserve their decision to become part of the class until the validity of the cause asserted by the named plaintiffs on behalf of the class has been determined." (*Id.* at p. 1011.) It noted, "for a defendant [one-way intervention] holds the terrors of an open-ended lawsuit that cannot be defeated, cannot be settled, and cannot be adjudicated. To him it presents a classic no-win option." (*Ibid.*)

The California Supreme Court adopted the *Home Savings* rule in *Green v. Obledo* (1981) 29 Cal.3d 126 [172 Cal.Rptr. 206, 624 P.2d 256] (*Green*), expanding it to protect plaintiffs against postmerits class decertification. It noted, "Although this [*Home Savings*] rule has thus far been applied only for the benefit of defendants, no reason appears why plaintiffs should not also enjoy its benefits . . . ." (*Id.* at p. 146.) Thus, it required class certification be decided before the merits, "whether the motion to certify or decertify be made by the plaintiff or the defendant." (*Id.* at p. 148.) On the other hand, it created a narrow exception to postmerits decertification where a

party could show "changed circumstances making continued class action treatment improper." (*Ibid.*)

The California Supreme Court has since applied *Green*'s postmerits decertification analysis to postmerits certification. (*Fireside Bank v. Superior Court* (2007) 40 Cal.4th 1069 [56 Cal.Rptr.3d 861, 155 P.3d 268] (*Fireside*).)[13] It noted, "Of course, just as we recognized in *Green* that there was no reason not to apply the general *Home Savings* rule to decertification motions, so there is no reason not to apply this limited *Green* exception to certification motions. Thus, under *Green*, postmerits certification may be permitted when there is a clear showing of changed circumstances." (*Fireside*, at p. 1082.)

*Fireside* sets forth a strict rubric for postmerits certification. "If a party seeks and obtains a merits ruling before moving for class certification, it must demonstrate changed circumstances to justify its belated motion for class certification. [Citation.] Absent a showing of changed circumstances, the trial court may not consider the motion; absent a further finding of a compelling justification, it may not grant it." (*Fireside*, *supra*, 40 Cal.4th at p. 1088.)

This rubric provides a procedural reason to affirm the court's denial of defendant's class certification motion. Defendant, having "s[ought] and obtain[ed] a merits ruling before moving for class certification," failed to "demonstrate changed circumstances to justify its belated motion for class certification." (*Fireside*, *supra*, 40 Cal.4th at p. 1088.) The record suggests no practical reason why defendant could not have moved for class certification sooner, other than to maximize its strategic advantage.

■ Defendant nevertheless contends the *Home Savings* rule does not apply here because this is a "mandatory" class action posing no risk of one-way intervention. A mandatory class action is one certified because (1) separate, individual actions could prejudice the defendant or absent class members, or (2) the defendant's alleged misconduct applied generally to the class, making classwide injunctive relief appropriate. (Fed. Rules Civ. Proc., rule 23(b)(1), (2), 28 U.S.C.; see also 2 Conte & Newberg, Newberg on Class Actions (4th ed. 2002) § 4:1.) Absent class members cannot opt out of a class action certified pursuant to these subdivisions; their inclusion is mandatory. (2 Conte & Newberg, *supra*, § 16:17.) Thus, class members in a mandatory class action cannot adopt the "wait and see" approach derided as one-way intervention.

---

[13] The court decided *Fireside*, *supra*, 40 Cal.4th 1069, while this appeal was pending. *Fireside*, like other judicial opinions clarifying existing law, operates retroactively. (*Newman v. Emerson Radio Corp.* (1989) 48 Cal.3d 973, 978 [258 Cal.Rptr. 592, 772 P.2d 1059].) Defendant addressed *Fireside* in its reply brief, and both parties discussed it at oral argument. We require no additional briefing.

But even if this is a mandatory class action from which absent class members cannot opt out, we cannot opt out of the *Home Savings* rule.[14] The California Supreme Court well understands one-way intervention. A section of the *Fireside* opinion is entitled, "One-way Intervention," the first subsection of which is entitled, "The Rule Against One-way Intervention." (*Fireside, supra,* 40 Cal.4th at p. 1078.) The court analyzed the issue at length and in depth. (*Id.* at pp. 1078–1079.) The court could have restricted its analysis of the *Home Savings* rule to nonmandatory class actions, but it did not. And the court could have limited its holding to *plaintiffs* seeking postmerits certification—the situation risking one-way intervention—but it instead spoke broadly of *parties* seeking postmerits certification: "If a party seeks and obtains a merits ruling before moving for class certification, it must demonstrate changed circumstances to justify its belated motion for class certification." (*Fireside,* at p. 1088.) Given a choice between applying the clear, unambiguous language of the California Supreme Court or adopting defendant's federal law based, policy-driven analysis to the contrary, we choose the former. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

Defendant takes out of context *Fireside*'s comment that "the scope of any rule should be coextensive with its rationale," wrongly claiming it allows postmerits certification in cases posing no risk of one-way intervention. (*Fireside, supra,* 40 Cal.4th at p. 1084.) By the time *Fireside* made this comment, it had already broadly endorsed the *Home Savings* rule and *Green*'s "changed circumstances" exception, applying them equally to plaintiffs and defendants seeking postmerits certification. (*Fireside,* at pp. 1081–1082.) And *Fireside* did so not just to protect against one-way intervention, but also for reasons of "judicial efficiency" and logic. (*Id.* at pp. 1074, 1083.) The comment arises during *Fireside*'s analysis of a narrow issue: Is a motion for judgment on the pleadings directed to the merits, such that the court should decide class certification before deciding the motion? Thus, *Fireside* considered "the range of motions that implicate the rules governing one-way intervention." (*Id.* at p. 1084.) It concluded any motion sufficiently substantive to create a risk of one-way intervention should be decided after the class issues are decided. (*Id.* at pp. 1085–1086.) It concluded courts should decide class certification before deciding a motion for summary judgment, summary adjudication, or judgment on the pleadings, depending on the issue raised. (*Ibid.*)

*Fireside*'s analysis of which motions are merits directed does not trump its prior analysis and broad holding on our issue. It unambiguously held a party

---

[14] We therefore need not determine whether this case would in fact be a "mandatory" class action under the federal rules and express no opinion thereon. Defendant's request to take judicial notice of complaints in other actions is denied.

cannot seek class certification after obtaining a concededly merits-directed ruling without showing changed circumstances and a compelling justification. (*Fireside, supra,* 40 Cal.4th at p. 1088.) Defendant, having done neither, waived any right to class certification.

Finally, *Fireside* stressed that application of the *Home Savings* rule is best left to the court's discretion. It stated, "Given a trial court's broad discretion to structure and streamline class action proceedings, the appropriate standard of review is abuse of discretion." (*Fireside, supra,* 40 Cal.4th at p. 1087; accord, *Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435 [97 Cal.Rptr.2d 179, 2 P.3d 27] [courts "are afforded great discretion in granting or denying certification"].) Accordingly, even if the *Home Savings* rule does not *necessarily* apply here as a matter of law, the court still could *choose* to apply it to maximize efficiency without abusing its broad discretion to structure this case. Either way, we affirm.[15]

## 2. *Postmerits Certification Would Wrongly Give Binding Effect to a Nonbinding Judgment*

 *Fireside* also highlighted an independent, substantive reason to affirm the order denying class certification. The opinion began, "A largely settled feature of state and federal procedure is that trial courts in class action proceedings should decide whether a class is proper and, if so, order class notice before ruling on the substantive merits of the action. [Citations.] The virtue of this sequence is that it promotes judicial efficiency, by *postponing merits rulings until such time as all parties may be bound,* and fairness, by ensuring that parties bear equally the benefits and burdens of favorable and unfavorable merits rulings." (*Fireside, supra,* 40 Cal.4th at p. 1074, italics added.)

The reference to binding "all parties" harkens back to a warning given to defendants by *Home Savings I.* That case warned defendants they cannot bind absent class members to a precertification adjudication. It observed, "notification makes possible a binding adjudication and an enforceable judgment with respect to the rights of the members of the class. Absent such notification no member of the class need be bound by the result of the litigation." (*Home Savings I, supra,* 42 Cal.App.3d at p. 1011.) Thus, "if defendant prevails in the first cause of action involving merely individual members of the class, no other members of the class need be bound by the outcome, for they were not parties to the lawsuit and received no notification about it." (*Ibid.*)

---

[15] For the first time in its reply brief on appeal, defendant contends plaintiff waived the protection of the *Home Savings* rule by defending the precertification summary judgment motion on the merits. Defendant has "doubly waived" this claim. (*Heiner v. Kmart Corp.* (2000) 84 Cal.App.4th 335, 351 [100 Cal.Rptr.2d 854].)

*Home Savings II* reiterated this warning to defendants. (*Home Savings II*, *supra*, 54 Cal.App.3d at pp. 211–212.) The plaintiffs there sought summary judgment; the defendant moved to stay adjudication of the motion until the court resolved class certification. (*Id.* at pp. 210–211.) The plaintiffs contended summary judgment posed no risk of one-way intervention because the defendant could seek appellate review and stare decisis would preclude further litigation by absent class members. (*Id.* at p. 212.) The court was unconvinced. "Adequacy of appellate review and availability of stare decisis are strong practical reasons why a litigant may desire adjudication of a motion for summary judgment in an individual action, but they cannot compel a class litigant to proceed in this manner, nor do they bind absent members of the class." (*Ibid.*)

*Home Savings II* noted defendants risk only their own due process rights, not those of the absent-and-unbound class members, by seeking adjudication of a named plaintiff's claims without class certification. "Such adjudication will bind an individual plaintiff, it may bind the defendant in similar actions on the principle of collateral estoppel, but it will not bind absent members of the class. [Citations.] If a defendant chooses to run the risk of collateral estoppel on an unfavorable judgment, it is defendant's right to due process that it hazards, not someone else's." (*Home Savings II*, *supra*, 54 Cal.App.3d at p. 212.)

The California Supreme Court quickly echoed these warnings to defendants seeking precertification adjudication in two cases, notably *before* it adopted the *Home Savings* rule. In *People v. Pacific Land Research Co.* (1977) 20 Cal.3d 10 [141 Cal.Rptr. 20, 569 P.2d 125] (*Pacific Land*), the court stated, "Failure to require notification of the class before a decision on the merits prevents a binding adjudication against the class because members of the class who were not notified are not barred by the determination in the defendant's favor since they were not parties." (*Id.* at p. 17.) And in *Civil Service Employees Ins. Co. v. Superior Court* (1978) 22 Cal.3d 362 [149 Cal.Rptr. 360, 584 P.2d 497], it stated, "Even though a determination of the partial summary judgment issue in [defendant's] favor may not have been legally binding on unnotified class members, defendant assumed that risk" by acquiescing to adjudication of the motion before class notification. (*Id.* at p. 374.)

The California Supreme Court has repeated this warning twice again. (*Fireside*, *supra*, 40 Cal.4th at p. 1074 [deciding class certification first

"postpon[es] merits rulings until such time as all parties may be bound"]; *Green, supra,* 29 Cal.3d at p. 147, citing *Pacific Land, supra,* 20 Cal.3d at pp. 16–17.)[16]

This consistent warning to defendants seeking precertification summary judgment must mean something. It would be meaningless to warn defendants that winning summary judgment before class certification will not bind class members, if defendants could simply move for class certification after obtaining summary judgment.

Despite 50-plus pages of exhaustively researched briefing covering 30 years of federal and California class action jurisprudence, defendant cannot cite a single case in which a defendant obtained class certification after first obtaining summary judgment against the named plaintiff's individual claim. This lack of precedent is telling.

Defendant instead offers easily distinguished cases in which a *plaintiff* sought class certification. In three cited cases, the court granted the certification motion at the same time as deciding the merits in the plaintiff's favor. (*Lowry v. Obledo* (1980) 111 Cal.App.3d 14, 20 [169 Cal.Rptr. 732] [plaintiffs simultaneously filed motions for class certification and summary judgment; court granted motions simultaneously]; *Larionoff v. United States* (1976)

---

[16] Federal courts share this concern. (*Cowen v. Bank United of Texas, FSB* (7th Cir. 1995) 70 F.3d 937, 941 [by obtaining precertification judgment, "the defendant loses the preclusive effect on subsequent suits against him of class certification"]; *Schwarzschild v. Tse* (9th Cir. 1995) 69 F.3d 293, 297 ["when defendants obtain summary judgment before the class has been properly certified or before notice has been sent . . . the district court's decision binds only the named plaintiffs"]; *Wright v. Schock* (9th Cir. 1984) 742 F.2d 541, 544 [precertification judgment "will not be res judicata as to other individual plaintiffs or other members of any class that may be certified"]; *Postow v. OBA Federal S & L Ass'n* (D.C. Cir. 1980) 201 U.S. App.D.C. 384 [627 F.2d 1370, 1382] [defendants moving for summary judgment before class certification " 'assume the risk that a judgment in their favor will not protect them from subsequent suits by other potential class members, for only the slender reed of *stare decisis* stands between them and the prospective onrush of litigants' "]; *Katz v. Carte Blanche Corporation* (3d Cir. 1974) 496 F.2d 747, 758–759 [before certification, "[j]udgment against [the plaintiff] would not protect [the defendant] against other class members"]; see also 7AA Wright et al., Federal Practice and Procedure (3d ed. 2007) § 1785 ["[i]f summary judgment is granted prior to certification, the decision will bind only the named parties"]; Herr, Manual for Complex Litigation (4th ed.) § 21.133 ["[t]he court may rule on [summary judgment motions] or other threshold issues before deciding on certification; however, such rulings bind only the named parties"]; 2 Conte & Newberg, *supra,* Newberg on Class Actions, § 7:15 ["if a [precertification] motion to dismiss or for summary judgment is granted in favor of the defendants, the entire complaint would normally be dismissed, and the court would not reach the class determination. Even in this situation, therefore, the resulting order would not be binding on the class which would not suffer prejudice"]; Fed. Rules Civ. Proc., rule 23, 28 U.S.C., Advisory Com. Notes, 2003 amendments ["[t]he party opposing the class may prefer to win . . . summary judgment as to the individual plaintiffs without certification and without binding the class that may have been certified"].)

175 U.S. App.D.C. 32 [533 F.2d 1167, 1172] [court simultaneously granted plaintiffs' motions for class certification and summary judgment, unclear in which order motions had been filed]; *Jimenez v. Weinberger* (7th Cir. 1975) 523 F.2d 689 [court simultaneously decided merits and awarded classwide relief, though without formally certifying class].) In three other cited cases, the court decided the certification motion before addressing the merits. (*Bell v. American Title Ins. Co.* (1991) 226 Cal.App.3d 1589, 1596–1598 [277 Cal.Rptr. 583] [court granted plaintiffs' class certification motion, then approved settlement disposing of class claims and precluding opt outs]; *Miller v. Woods* (1983) 148 Cal.App.3d 862, 871–872, 881 [196 Cal.Rptr. 69] [trial court denied plaintiffs' class certification motion before denying their summary judgment motion; appellate court reversed and remanded with directions to certify the class and grant summary judgment on certain causes of action]; *Gonzalez v. Jones* (1981) 116 Cal.App.3d 978, 982, 986 [171 Cal.Rptr. 567] [trial court denied plaintiffs' class certification motion; appellate court reversed and remanded with directions to certify class and then decide merits].) In one case, the court granted the plaintiffs' motions for summary judgment and class certification, though it is unclear in which order the motions were filed or decided. (*Holmes v. California Nat. Guard* (2001) 90 Cal.App.4th 297, 307–309 [109 Cal.Rptr.2d 154].)

None of these cases allowed a defendant to seek postmerits certification. None allowed precertification summary judgment against the plaintiff's individual claim to bind absent class members. None support defendant's attempt to foist a binding judgment against absent class members by seeking postmerits certification.

The cited case closest to defendant's position still misses the mark. In *Frazier v. City of Richmond* (1986) 184 Cal.App.3d 1491 [228 Cal.Rptr. 376] (*Frazier*), the court certified a plaintiffs' class, and later held a prior decision in a putative but uncertified class action barred its claims by res judicata. (*Id.* at pp. 1495, 1497–1499.) Defendant contends the *Frazier* defendants effectively obtained postmerits certification—one court adjudicated the merits in the prior case, later a second court certified a class bound by the prior decision—but that interpretation is tenuous on its face. Moreover, the *Frazier* trial court certified the class *before* reaching the merits. (*Id.* at p. 1495.) It did not allow the defendants to prevail against the named plaintiffs first and then move for class certification. No subsequent case has relied upon *Frazier* to allow a defendant to obtain postmerits certification.

If anything, *Frazier* points out the road defendant needs to follow. Rather than seeking postmerits certification, defendant must resort to some other doctrine to combat the onslaught it fears of subsequent litigation by absent class members. Possible doctrines may include res judicata or stare decisis.

(*Frazier, supra*, 184 Cal.App.3d at pp. 1497–1499; *Home Savings II*, *supra*, 54 Cal.App.3d at p. 212.) But defendant must wait to assert these doctrines in subsequent litigation, if any; we express no opinion on their viability. We note only that they do not support postmerits certification in this case.

## DISPOSITION

The judgment and the order denying class certification are affirmed. In the interests of justice, each party shall bear its own costs on appeal.

O'Leary, Acting P. J., and Fybel, J., concurred.

The petition of appellant Rae F. Ortiz for review by the Supreme Court was denied March 12, 2008, S159802. Moreno, J., did not participate therein.